| | | |
|---|---|---|
| JIMMY L. HAMBLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-0325-CVE-JFJ |
| | ) | |
| CITY OF TULSA, and | ) | |
| RAY DRISKELL, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court is defendants City of Tulsa (the City) and Tulsa Fire Chief Ray Driskell's (Chief Driskell) joint motion for summary judgment (Dkt. # 36).

This is an employment discrimination case arising under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. § 4301 et seq. In short, the Tulsa Fire Department (TFD) transferred, demoted, and terminated plaintiff—who, at the time of these events, was a firefighter and a Marine—and the Court must decide whether a rational trier of fact could conclude that his military status was a substantial or motivating factor in any of these employment actions.

**I.**

The following facts are undisputed:[1] On March 2, 1998, TFD hired plaintiff as a firefighter,

a job he maintained until TFD terminated him on April 29, 2013. Dkt. # 36-1, at 2; Dkt. # 36-24, at

9. Throughout this time period, plaintiff was also an officer in the Reserve Component of the United

States Marine Corps (USMC). Dkt. # 36-29, at 2. In 2003, he changed his military status from

inactive reservist to selective reservist, which meant that he was required to deploy for duty, should

the USMC activate his unit. Id. at 2-3. As a result, between 2003 and his termination in 2013,

plaintiff took at least twenty-four months of military leave from TFD. Dkt. # 36-2.[2]

On December 1, 2011, the USMC activated plaintiff through September 30, 2012. Id. at 13.

As of December 1, 2011, plaintiff was the captain for TFD's station 19, which was a "single-

---

[1]    In his response to defendants' motion for summary judgment, plaintiff includes a "statement
of the case" (Dkt. # 44, at 6-11). It includes just three citations to the record and does not
specifically controvert defendants' statement of "undisputed facts," which cites to the record
after each fact set forth (Dkt. # 36, at 6-21). Local Civil Rule 56.1(c) provides,

> The response brief in opposition to a motion for summary judgment . . . shall
> begin with a section which contains a concise statement of material facts to
> which the party asserts genuine issues of fact exist. Each fact in dispute shall
> be numbered, shall refer with particularity to those portions of the record
> upon which the opposing party relies and, if applicable, shall state the
> number of the movant's facts that is disputed. All material facts set forth in
> the statement of the material facts of the movant shall be deemed admitted
> for the purpose of summary judgment unless specifically controverted by the
> statement of material facts of the opposing party.

Accordingly, because plaintiff fails to specifically controvert any of the facts that defendants
set forth in their statement of undisputed facts, the Court deems these facts admitted.

[2]    The military orders defendants attach to their motion for summary judgment reflect that
plaintiff was on military leave during the following periods: 6/6/2008 - 6/20/2008; 5/7/2009 -
5/27/2009; 8/10/2009 - 9/30/2009; 2/5/2010 - 7/2/2010; 7/5/2010 - 9/30/2010; 2/13/2011 -
6/22/2011; 12/1/2011 - 9/30/2012. Id.

company" station. Dkt. # 36-9, at 7, 35. TFD's single-company stations have one captain, one driver, and two firefighters per shift, whereas its "two-company stations," including station 20, have two captains, two drivers, and four firefighters per shift. Id. at 35. Shortly after plaintiff's December 1, 2011 deployment, TFD—unbeknownst to him—transferred plaintiff from station 19 to station 20. Dkt. # 36-3, at 4. The transfer did not affect his salary, rank, or job duties. Dkt. # 36-29, at 15. According to the transfer order, TFD moved plaintiff from station 19 (a single-company station) to station 20 (a two-company station) in order to "maintain organizational efficiency." Dkt. # 36-3, at 3. As TFD Assistant Fire Chief Kenny Myers testified, "[i]t . . . is very difficult to staff a team . . . if you have somebody gone for long periods of time at a single-company station in comparison to a two-company station where we have lots of personnel . . . ." Dkt. # 36-27, at 5. Prior to this transfer, TFD had transferred plaintiff twenty-two times throughout his career, for reasons related to organizational efficiency and his professional development. Dkt. # 36-3.

On September 30, 2012, plaintiff returned from his December 1, 2011 deployment. Dkt. # 36-29, at 9. Initially, he requested and TFD agreed to an October 13, 2012 report for duty date. Dkt. # 36-10, at 3. On the morning of October 3, 2012, in preparing to resume his work as a firefighter, plaintiff visited District Chief Bryan Hickerson, who had been plaintiff's supervisor at station 19 prior to his December 1, 2011 deployment. Dkt. # 36-29, at 10. During this visit, Hickerson told plaintiff that TFD transferred him to station 20 and directed plaintiff to speak with Myers if he wanted an explanation. Dkt. # 36-5, at 2. In response, according to Hickerson, who emailed Myers after plaintiff's visit to report aspects of the interaction that concerned Myers, plaintiff "seemed to become upset" and said that the transfer was "not going to work for him." Id.

Later that day, after visiting with Hickerson, plaintiff called the TFD administrative office to discuss getting back on payroll. Dkt. # 36, at 9. According to TFD administrative assistant Shanna Banks, who answered plaintiff's call, she told him that he needed to bring a copy of his DD214 military discharge form and, forty-five minutes later, he showed up at her desk with the form "in an angry mood." Id. Additionally, Banks stated,

> [Plaintiff] proceeded to tell me to email him all communications between me and [a colleague] and to keep all things with his name on it because the administration was 'out to get him' and that it was going to 'F#$KING RAIN.' He also accused us of losing his military orders that he gave us; which isn't true.

Id. Jennifer Walter-Buehler, Banks's office-mate who overheard the incident, corroborates Banks's account; according to Walter-Buehler,

> [Plaintiff] was very angry and agitated and was using foul language while ranting. He said fuck at least a couple of times during his rant. I don't remember his exact words but I got the feeling that he felt someone was out to get him, as in a superior, is what I surmised.

Dkt. # 36-7.

Three days later, on October 6, 2012, plaintiff met with Myers, seeking an explanation for his transfer from station 19 to station 20. Dkt. # 36-8. According to Myers, during their meeting plaintiff was "pretty aggressive" and expressed that "he'd had a rough year." Dkt. # 36-27, at 7-10. In response, Myers asked plaintiff if he "had somebody to talk to" and advised him that TFD was not "pushing [him] to come back right now." Id. As plaintiff testified, Myers also stated, "I can't have captains on my shift being gone for extended periods of time . . . I need leadership out there." Dkt. # 36-29, at 12-13. Myers testified that he does not recall saying those "exact words," but that he did state, "I . . . need some leadership out there" and was referring to the difficulty of staffing a single-company station with "somebody gone for long periods of time." Dkt. # 36-27, at 4-5.

Additionally, according to Myers, in order to make plaintiff "feel better," he said, "[w]hen the military calls you, you're going to go, and that's awesome . . . . It's ludicrous to think that the fire department would ever be able to trump that." Dkt. # 44-10, at 5.

After meeting with Myers, plaintiff went to station 19 to retrieve his belongings. Dkt. # 36-9. Once there, he interacted with Captain Joseph Carollo, who later emailed Myers to report aspects of their interaction that troubled him; Carollo stated,

> . . . [Plaintiff] accused me of moving his personal belongings out of the captain area locker room. [His] demeanor and body language was of the aggressive nature . . . and I felt [plaintiff] was looking for an [sic] confrontation. I could tell [he] was agitated and upset.

Id.

On or about October 7, 2012, as plaintiff's October 13 report for duty date approached, TFD contacted him to request that he see Phillip Berry, D.O., Tulsa City medical director, for a "fit for duty" check. Dkt. # 36-29, at 17. According to Chief Driskell, TFD asked plaintiff to do so because "[he] was returning from an extended leave and was reportedly acting in an uncharacteristically aggressive manner." Dkt. # 36-4, at 3.

On October 9, 2012, plaintiff emailed Chief Driskell to inform him that he was going to rescind his initial report for duty date of October 13, 2012, and, instead, take the ninety days leave that he was authorized after an extended deployment, in order to "spend time with . . . family and catch up on the routine things that need attention after a lengthy activation." Dkt. # 36-10, at 3. That same day, according to plaintiff, he encountered Captain Matthew Phippen while running on Riverside Drive in Tulsa, Oklahoma, and Phippen told him that "there was a rumor going around the fire department that when and if [he] returned to . . . the fire department, [the administration was] going to try to either terminate [him] or force [him] to resign." Dkt. # 36-29, at 31-32.

The next day, on October 10, 2012, plaintiff visited Dr. Berry for his fit for duty check. Dkt. # 36-11. In a memo to TDF, Dr. Berry described the visit. Dkt. # 36-11. He stated,

> During my 45 minute evaluation of [plaintiff] he stated to me that 'I screwed up, I did not handle my encounter with the department well and flew off the handle more than I should.' He agreed that he probably should have taken more time off before attempting a return to work. We went on to discuss that as a current military officer and fire department company officer certain behavior was expected and he had probably stepped over the line.

Id.

Later that month, while on his authorized ninety day extended leave, plaintiff filed a complaint with the Veterans' Employment and Training Services (VETS) office of the Department of Labor. Dkt. # 36-12. In it, he alleged that, in transferring him from station 19 to station 20, TFD violated his rights under USERRA. Id. VETS found plaintiff's claim meritorious; in a letter to the City, VETS stated, "we have determined that the evidence supports [plaintiff's] . . . allegation [that] he was not properly reinstated when he return [sic] to work from deployment on October 3, 2012." Id. at 2.[3] Accordingly, VETS concluded, under USERRA plaintiff was entitled to "reinstatement into the position that he would have attained with reasonable certainty if not for the absence due to uniformed service . . . ." Id. In a response letter to VETS, the City stated,

> The City believes it complied with USERRA when it agreed to return [plaintiff] back to work on October 13, 2012, as a Captain in the Fire Department at Station 20. Because firefighters are routinely transferred for a variety of reasons daily, it was highly likely that [plaintiff] would have been transferred to another station regardless of his military leave and there was no legal obligation to place him at station 19. Nevertheless, the department agreed to transfer Mr. Hamblin back to station 19 as he requested to resolve this issue . . . .

Dkt. # 36-13, at 4 (emphasis added).

---

[3]     As part of his investigation, the VETS investigator stated that he confirmed with Phippen that Phippen heard a rumor that TFD intended to terminate plaintiff or force plaintiff to resign. Dkt. # 44-7, at 2. The VETS investigator also stated, however, that Phippen did not identify who he heard this rumor from—Phippen said only that he overheard it being discussed between "two privates during a shift change." Id.

On December 28, 2012, as his authorized ninety day extended leave (which began on September 30, 2012) neared its end, plaintiff emailed TFD Administrative Chief Chuck French to request a report for duty date of January 1, 2013. Dkt. # 36-14, at 4. In response, French told plaintiff that his platoon at station 19 would not be active until January 4, 2013. Id. at 5. French also informed plaintiff that on January 4, 2013, he was required to report to Dr. Berry for another fit for duty check and TFD headquarters to address "administrative business." Id.

Plaintiff visited Dr. Berry on January 4, 2013; in describing the visit, Dr. Berry stated, "[o]ther than his negativity and having a mildly flat affect, [plaintiff] appeared to have no mental or physical issues that would pose a safety risk on him returning to work in full capacity." Dkt. # 36-11.

Later that day, plaintiff reported to TFD headquarters, where TFD convened an administrative hearing to address the reports from District Chief Hickerson, Shanna Banks, Jennifer Walter-Buehler, Assistant Fire Chief Myers, Captain Carrollo, and Dr. Berry concerning plaintiff's confrontational demeanor and use of profane or threatening language. Dkt. # 36-15. TFD viewed this conduct, if true, as potentially in violation of its Administrative Operating Procedures § 111.1 ("Members of the Tulsa Fire Department will conduct themselves in a self-disciplined manner that will reflect credit upon themselves and the department.") Dkt. # 36-15, at 2; Dkt. # 36-16.

Myers conducted the hearing. To begin, he told plaintiff that there were two rules, " . . . to tell the truth [and] participate." Dkt. # 36-15, at 2. Failure to comply with these rules, Myers explained, "could be grounds for discipline up to and including termination." Id. During the hearing, Myers asked plaintiff whether any of the following were true: (1) Hickerson's statement that plaintiff responded angrily when Hickerson told him that he had been transferred to station 20; (2)

Banks's statement that plaintiff appeared at TFD's administrative office in an angry mood, accused the offices of losing his military orders, and said he was going to make it "fucking rain;" (3) Walter-Buehler's statement corroborating Banks's account; (4) Carollo's statement that plaintiff was confrontational upon visiting station 19 to retrieve his belongings; and (5) Dr. Berry's statement that plaintiff, during his fit for duty check, admitted that he "screwed up," "did not handle [his] encounter with the department well," and "flew off the handle more than [he] should." Id. at 3-6. In response to all of Myers's inquiries, plaintiff categorically denied the alleged conduct and stated that he either could not recall making or did not make the statements attributed to him. Id. In reaction to plaintiff's blanket denial, Deputy Chief Steven Gage interjected and had the following discussion with plaintiff,

> SG: I have a concern that you don't recall any of these conversations with anybody. I'm not sure where it's at, but you were given the basic rules to this hearing when we began, right?

> Plaintiff: Yes, sir.

> SG: And what were those?

> Plaintiff: Participate and don't lie.

> SG: Okay, well at this point I feel like we have a serious issue with where the truth is at. So as of right now, I'm going to end this meeting but I'm putting you on Administrative leave and we're going to do some more fact finding and make a determination. I'm going to give you the opportunity to possibly reflect back on these conversations . . . and Monday morning I'm going to conduct a [pre-termination] hearing.

Id. at 9-10.

On January 10, 2013, TFD reconvened plaintiff's hearing (which, by the time, had escalated to a pre-termination hearing). Dkt. # 36-17; Dkt. # 36-19. Shortly after commencing, Myers interrupted the hearing to allow Chief Driskell, Union President Chad Miller, and plaintiff to

privately discuss whether plaintiff intended to admit to any of the conduct at issue. Dkt. # 36-29. Plaintiff told Chief Driskell that he did not so intend. Id. The hearing resumed, with Chief Driskell presiding, and plaintiff reiterated his categorical denials of all of the allegations against him. Dkt. # 36-18.  In response, Chief Driskell asked him if he (1) "need[ed] help;" (2) was aware that TFD had "psych services;" and (3) understood Chief Driskell's "concern about whether [plaintiff] was being accurate in everything [he was] saying." Id. at 5-6. Plaintiff's answers were "no, sir,"  "yes, sir," and "yes, sir" respectively. Id. To conclude the hearing, Chief Driskell stated, "[a]ll right . . . [y]ou're going to be demoted to private effective immediately." Id. at 6. After the hearing, TFD issued a disciplinary action report, which stated that TFD demoted plaintiff because he "did not comply with the rules of the Administrative Hearing." Dkt. 36-20, at 2.

From that point on,  plaintiff never worked at TFD again; over the next few months, he took a combination of military leave, vacation, and sick leave.  Dkt. # 36-29, at 3. Then, on April 19, 2013, while still on leave, plaintiff was arrested for "Domestic [assault and battery] by Strangulation."  Dkt. # 36-22. The Tulsa County Sheriff's Office reported the arrest to TFD, and, in response, TFD convened another pre-termination hearing on April 29, 2013, to learn more about the incident and determine whether plaintiff should be terminated for violating TFD's Administrative Operating Procedures § 111.1 ("Members of the Tulsa Fire Department will conduct themselves in a self-disciplined manner that will reflect credit upon themselves and the department.") and § 111.2  ("Members of the Tulsa Fire Department will be subject to all federal laws, state statutes, and city ordinances."). Dkt. # 36-16.

Chief Driskell conducted the hearing and, to begin, re-reviewed the rules—i.e. to tell the truth and participate—with plaintiff. Dkt. # 36-24, at 3. Additionally, Union President Miller

requested that TFD grant plaintiff a <u>Garrity</u> waiver,[4] which TFD did. Chief Driskell proceeded to question plaintiff about his arrest; he showed plaintiff the police report and plaintiff stated that it was "fairly accurate" but added that he was "not going to answer any questions regarding anything that may impact pending litigation . . . ." <u>Id.</u> at 4. In response, Chief Driskell asked plaintiff whether this meant he was "choosing not to comply" with the rules of the proceeding, to which plaintiff replied,

> [w]hat I will tell you sir is that I was on the property that I own my son was there, there's people in this room that I work with for a long time that know my son has a pretty significant history of drug abuse . . . where he has become aggressive he has been known to carry a knife, he has presented that knife to me on a couple of different occasions and this is the first time that I actually had to defend myself.

<u>Id.</u> at 4-5. Thereafter, Chief Driskell repeatedly asked plaintiff for more information about the arrest, and told him that if he remained unforthcoming he would have "[no] alternative" but to terminate him, but plaintiff refused to supply any further information. <u>Id.</u> at 5-9. Toward the hearing's end, Chief Driskell stated, "I'm going to ask you one more time with everything I've got in front of me that we demoted you, it's your history of issues and now I've got a felony charge against you carried today tell me why I should not terminate you today." <u>Id.</u> at 7. In response, plaintiff stated, "[c]ause of due process of the law Chief and I'm going to let it work for me." <u>Id.</u> In response, and to conclude the hearing, Chief Driskell said, " . . . we can go back and forth on this discussion . . . here's my issue you're a member before this department and I've asked you to tell me what's happened and you chose not to so effective immediately you're terminated . . . ." <u>Id.</u> at 9.

---

[4]     <u>See</u> <u>Garrity v. State of New Jersey</u>, 385 U.S. 493 (1967) (holding that the Fifth and Fourteenth Amendments give public employees the right not to have employer coerced statements used against them in subsequent criminal proceedings).

After the hearing, plaintiff filed a second complaint with VETS alleging that, in demoting and terminating him, TFD violated his rights under USERRA. Dkt. # 36-25. This time, however, VETS concluded that the evidence did not "support a violation of USERRA." Id.

On June 8, 2016, plaintiff filed this lawsuit. He brings one claim under USERRA against both the City and Chief Driskell, individually and in his official capacity, alleging that "defendants knowingly and willingly violated 38 U.S.C. §§ 4311, 4312, 4313, 4316, 4317 and 4318 by discriminating against plaintiff, by denying him benefits of employment in the form of failing to reemploy plaintiff, improper contributions to and loss of pensions benefits,[5] the freedom from a hostile work environment, and wrongful termination." Dkt. # 2, at 7-8. Plaintiff seeks liquidated damages in an amount equal to his loss pursuant to 38 U.S.C. § 4323(d)(1)(C), and an award of reasonable attorney's fees, expert witness fees, and other litigation expenses under 38 U.S.C. § 4323(h). Id. at 8.

Defendants filed a joint motion for summary judgment (Dkt. # 36) on plaintiff's claim.[6]

---

[5] At his deposition, however, plaintiff testified that, prior to being terminated, there were no pension benefits that he was not given or denied as a result of his military service. Dkt. # 36-29, at 24. He stated that at one point he noticed "gaps in pension contributions from the City" but that when he brought these discrepancies to the City's attention "they eventually were corrected." Id. at 25.

[6] Defendants bring a joint motion for summary judgment because, according to defendants, "the standard for proceeding with a USERRA case, whether against the City or against Chief Driskell individually" is the same, as is the factual basis for plaintiff's allegations against the City and Chief Driskell. Dkt. # 36, at 22-23. Plaintiff does not contest this and the Court sees no reason to disallow it.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

# III.

Defendants argue that they are entitled to summary judgment on plaintiff's USERRA claim because (1) plaintiff fails to allege damages as a result of his transfer from station 19 to station 20; and (2) no rational trier of fact could conclude that plaintiff's military status was a substantial or motivating factor in TFD's decisions to demote and terminate him. Dkt. # 36, at 23-25, 26-34; Dkt. # 45, at 5, 7-11.[7]

USERRA provides that a uniformed service member "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment . . . on the basis of that membership . . . ." 38 U.S.C. § 4311(a). For service members deployed more than ninety days, USERRA requires employers to restore them to "the position of employment in which the person would have been employed if the continuous employment of such person with the

---

[7] Although the parties brief the issue of hostile work environment, the Court does not reach it because, in his response to defendants' motion for summary judgment, plaintiff states that his complaint "did not raise the issue of a hostile work environment." Dkt. 44, at 29. In addition, for the first time in his response, plaintiff argues that defendants violated his Fifth Amendment right against self-incrimination. Id. at 25. The Court does not reach this issue either because plaintiff has not pled a Fifth Amendment claim nor moved to amend his complaint in order to do so. See Fuqua v. Lindsey Management Co., Inc., 321 Fed. App'x 732, 734-35 (10th Cir. 2009) ("Normally a claim or theory that is not adequately raised in the complaint will not be considered." (citing Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003)) (This and other cited unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1). Finally, in his complaint, plaintiff alleges "improper contributions to and loss of pension benefits." Dkt. # 2, at 7-8. In his response, however, he does not address this issue. Moreover, plaintiff testified that he has not suffered any improper contributions to or loss of pension benefits. See supra note 5. The Court, therefore, presumes plaintiff has abandoned this argument and grants summary judgment on it in favor of defendants. See Hinsdale v. City of Liberal, Kansas, 19 Fed. App'x 749, 768-70 (10th Cir. 2001) (affirming district court's presumption that plaintiff abandoned an argument raised in his complaint where plaintiff did not address the argument in his response to defendant's motion for summary judgment).

employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." Id. § 4313(a)(2)(A).

In bringing a USERRA claim, "the employee 'bear[s] the initial burden of showing by a preponderance of the evidence that [his or her] military service was a substantial or motivating factor in the adverse employment action." Lewis v. Right of Passage, Inc., 217 Fed. App'x 785, 786 (10th Cir. 2007) (quoting Sheehan v. Dep't of Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001)). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditions its decision on that consideration." Id. (quoting Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005)). "If the employee meets his initial burden, 'the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." Id. at 786 (quoting Sheehan, 240 F.3d at 1014). "In the summary judgment context, the employee must establish a genuine issue of material fact as to whether his military status was a motivating factor in the adverse employment action to survive summary judgment." Id. at 787 (citing Hill v. Michelin N. Am., Inc., 252 F.3d 307, 313 (4th Cir. 2001)). "To prevail on summary judgment, the employer must then establish not just that it had a legitimate basis for taking the adverse employment action, but as a matter of uncontroverted fact that it would have taken the adverse employment action regardless of the employee's military status. Id. (citing Leisek v. Brightwood Corp., 278 F.3d 895, 900 (9th Cir. 2002)).

Where a trier of fact finds that an employer failed to comply with USERRA, the statute permits "three kinds of relief: (1) an injunction requiring an employer to comply with USERRA's provisions; (2) compensation for lost wages or benefits suffered by reason of the employer's failure to comply with USERRA; and (3) liquidated damages in an amount equal to lost wages or benefits

if the employer's failure to comply with USERRA was willful." <u>Dees v. Hyundai Moto Mfg.</u> <u>Alabama, LLC</u>, 368 Fed. App'x 49, 52-53 (11th Cir. 2010) (citing 38 U.S.C. § 4323(d)(1)(A)-(C)); <u>see</u> <u>also</u> 20 C.F.R. § 1002.312.

### i.

Defendants contend that they are entitled to summary judgment on plaintiff's argument that TFD's decision to transfer him from station 19 to station 20 violated USERRA because (1) the transfer did not affect his rank, salary, benefits, or job duties; (2) plaintiff had already been transferred twenty-two times, and, therefore, cannot show that he would not have been transferred even if he had not been deployed; and (3) plaintiff fails to allege damages as a result of his transfer. Dkt. # 36, at 23-25; Dkt. # 45, at 7-8 . In response, plaintiff does not specifically rebut defendants' arguments. Instead, he argues only that "[i]t is without question that the very reason plaintiff was transferred was because of his military service obligations and the number of shifts he missed due to those military service obligations." Dkt. # 44, at 18.

Defendants are entitled to summary judgment on plaintiff's argument that his military status was a substantial or motivating factor in TFD's decision to transfer him from station 19 to 20. Assuming without deciding that plaintiff's military status did motivate the transfer, plaintiff nevertheless fails to allege any damages as a result of the transfer, and, therefore—as defendants intimate but do not fully articulate—he lacks standing to bring this argument. [8] <u>See</u> <u>Citizen Center</u> <u>v. Gessler</u>, 770 F.3d 900, 909 (10th Cir. 2014) ("Constitutional standing involves three elements: (1) injury in fact; (2) causation; and (3) redressability."); <u>see</u> <u>also</u> <u>Dees</u>, 368 Fed. App'x at 52-53

---

[8]     Because the Court decides this argument on the ground that plaintiff lacks standing to bring it, the Court does not address defendants' alternative theories as to why they are entitled to summary judgment on it.

("Assuming . . . harassment . . . is a cognizable claim under USERRA, [plaintiff] lacks standing to bring such a claim. [Plaintiff] admits that he has not suffered any lost wages or employment benefits resulting from the alleged harassment."). Plaintiff alleges no injury in fact on account of the transfer—he admits that TFD transferred him back to station 19 before he ever had to report to station 20, and he makes no claim that he was denied or not given any benefits as a result of the transfer. Moreover, even assuming, arguendo, that the transfer constituted an injury in fact, plaintiff fails to show how USERRA's remedies could provide redress—the Court cannot require TFD to transfer plaintiff back to station 19 because he no longer works for TFD (and, before terminating him, TFD transferred plaintiff back to station 19 on its own accord), and the Court cannot require TFD to compensate plaintiff for lost wages or benefits suffered on account of the transfer because plaintiff does not allege any.

Accordingly, because plaintiff fails to allege a corresponding injury in fact or posit a theory of redressability, he lacks standing to raise the argument that TFD's decision to transfer him from station 19 to station 20 violated his rights under USERRA, and defendants' motion for summary judgment (Dkt. # 36) with respect to this argument is therefore **granted**.

### ii.

Defendants contend that they are entitled to summary judgment on plaintiff's arguments that his military status was a substantial or motivating factor in TFD's decisions to demote and terminate him. Dkt. # 36, at 26-34. Dkt. # 45, at 8-11. In an attempt to satisfy his initial evidentiary burden, plaintiff argues,

> . . .Plaintiff refuse[s] to concede that what he did was inappropriate . . . because there has always been and continues to exist a genuine issue of material fact as to whether [his] alleged [profane and threatening] statements were even made. The military nexus for these events stems from the initial request for reemployment- Plaintiff is

asked to provide documentation that he had never been required to provide before [i.e. the DD214 discharge form], he's told he's no longer assigned to the station that he's been at before he was deployed- a situation which has not happened throughout the course of his multiple deployments before, he's told to report for a 'fit-for-duty' check, also something he's never been required to do before, and the alleged threatening statements that didn't surface until after the VETS investigation began and just prior to the Administrative Hearing of January 4, 2013. The question of Plaintiff's truthfulness, however, and whether he violated a rule of the Administrative Hearing, is a measure of his credibility and cannot be determined by anyone but the trier of fact.

Dkt. # 44, at 24. As additional evidence of TFD's discriminatory animus, plaintiff points to the rumor that Captain Phippen allegedly overheard from two unidentified privates regarding TFD's intention to terminate plaintiff or force him to resign upon his return from his December 1, 2011 deployment. Id. at 28.

Plaintiff fails to satisfy his initial evidentiary burden; even viewing the evidence in the light most favorable to him, no rational trier of fact could conclude that his military status was a substantial or motivating factor in TFD's decisions to demote and terminate him. First, the Court does not consider the rumor that Phippen allegedly overheard because, as defendants argue (Dkt. # 36, at 28-29), plaintiff presents this evidence as inadmissible double hearsay testimony: to prove the rumor, plaintiff submits statements from himself and the VETS investigator that Phippen said that two unidentified TFD privates said that TFD intended to terminate plaintiff or force him to resign upon his return from deployment, and plaintiff attempts to use this alleged out of court statement to establish that TFD took his military status into account in deciding to demote and terminate him. See Fed. R. Evid. 801(c) ("Hearsay means a statement that the declarant does not make while testifying . . . and a party offers in evidence to prove the truth of the matter asserted in the statement."); 802 ("Hearsay is not admissible unless [a federal statute, these rules, or other rules prescribed by the Supreme Court] provides otherwise."); see also Thomas v. International Business

Machines, 48 F.3d 478, 485 (10th Cir. 1995) (" . . . hearsay testimony that would be inadmissible at trial may not be included . . . to defeat summary judgment . . . .").[9]

With respect to the evidence other than the rumor that plaintiff points to, no rational trier of fact could conclude, based upon it, that his military status was a substantial or motivating factor in TFD's decisions to demote and terminate him. Plaintiff does not explain, and the Court does not see, how TFD requiring him to submit a DD214 discharge form and perform a fit for duty check, even if TFD had never previously required him to do either of these things, tends to suggest that his military status was a consideration in the adverse employment actions TFD took against him. Additionally, plaintiff contends that defendants are not entitled to summary judgment because the question of his truthfulness at his hearings cannot be determined "by anyone but the trier of fact." Dkt. # 44, at 24. But the question of whether he was truthful at his hearings is irrelevant to his argument that his military status factored into TFD's decisions to demote and terminate him. Even assuming he was being truthful at his hearings (which the record suggests, overwhelmingly, was not the case), this does not change the fact that TFD demoted and terminated him not because he was

---

[9]     Citing no law, plaintiff states, "[t]he existence of such a statement was reported to VETS and documented, and its relevance and any weight given thereto is a genuine issue of material fact . . . ." Dkt. #44, at 29. Plaintiff seems to be invoking the rule that, on summary judgment, the non-movant need "not produce evidence 'in a form that would be admissible at trial.'" Thomas, 48 F. 3d at 485 (quoting Celotex, 477 U.S. at 324). The "content or substance of the evidence," however, "must be admissible," and plaintiff proffers no theory of admissibility for the alleged rumor. Id. (internal citation omitted).

a Marine, but because TFD believed (mistakenly or not) that he was refusing to be forthcoming about his misconduct and arrest.[10]

Significantly, assuming, <u>arguendo</u>, that plaintiff met his initial evidentiary burden, defendants would nevertheless be entitled to summary judgment on his argument that his military status factored into TFD's decisions to demote and terminate him because a rational trier of fact could conclude only that TFD would have demoted and terminated plaintiff regardless of whether or not he was a Marine. Regarding his demotion, five different TFD employees[11] and the Tulsa City medical director provided independent statements reporting that plaintiff had used profane, threatening language and was confrontational in and around early October 2012. In addition, at the hearings TFD convened to address these reports, in which the rules were to tell the truth and participate, plaintiff, in rote fashion, categorically denied every allegation against him. In reaction, TFD demoted plaintiff. Given this record, the only reasonable conclusions a trier of fact could draw are (1) that TFD demoted plaintiff because it was inconceivable to TFD that five of its employees (including the Assistant Fire Chief, a District Chief, and a Captain) and the Tulsa City medical director independently fabricated  allegations, during the same time period, that plaintiff had

---

[10]    The Court surmises that plaintiff's theory of the case is that TFD was unhappy that he took military leave so frequently and, accordingly, engaged in an organization-wide conspiracy to terminate him, which included forcing him to meet unprecedented administrative requirements and having employees and the Tulsa City medical director falsify statements alleging that he engaged in misconduct. Based on the evidence before the Court, however, no rational trier of fact could draw these conclusions.

[11]    Namely, District Chief Hickerson, Shanna Banks, Jennifer Walter-Buehler, Assistant Fire Chief Myers, and Captain Carrollo.

behaved in a confrontational fashion; and (2) that TFD, under these circumstances, would have demoted plaintiff whether he was a service member or not.[12]

With respect to TFD's decision to terminate plaintiff, the analysis is almost identical. After receiving a police report that plaintiff, who had yet to return to work since his demotion, had been arrested for assault and battery, TFD convened a third hearing. At the hearing, although he acknowledged the police report's veracity, plaintiff refused to provide TFD with anything but a generalized description of the incident. In response, TFD terminated plaintiff. Based on this record, a rational trier of fact could conclude only that TFD terminated him for his refusal to acknowledge serious, corroborated allegations in the previous hearings combined with his unwillingness to explain the circumstances of his arrest for a violent act and that, under these circumstances, TFD would have terminated him regardless of his military status. Accordingly, defendants' motion for summary judgment (Dkt. # 36) with respect to this plaintiff's arguments that his military status was a substantial or motivating factor in TFD's decisions to demote and terminate him is **granted**.

In sum, defendants are entitled to summary judgment on plaintiff's argument that TFD's decision to transfer him from station 19 to station 20 violated USERRA because plaintiff lacks standing to bring this argument, and defendants are entitled to summary judgment on plaintiff's arguments that his military status was a substantial or motivating factor in TFD's decisions to demote and terminate him because plaintiff does not submit evidence sufficient to create genuine issues of material fact as to these questions, and, even assuming he did, a rational trier of fact could

---

[12]     As plaintiff himself states in his response, "[c]learly Plaintiff's demotion was based on an alleged violation of the first rule [of the administrative hearings]- to tell the truth." Dkt. # 44, at 23.

conclude only that TFD would have demoted and terminated plaintiff whether or not he was a service member.

**IT IS THEREFORE ORDERED** that defendants' joint motion for summary judgment (Dkt. # 36) is **granted**. A separate judgment is entered herewith.

**DATED** this 30th day of October, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE